**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

_____
Sarit Tamar, Individually and on Behalf of All ⟩
Others Similarly Situated, ⟩
⟩
           Plaintiff, ⟩
⟩
           v. ⟩ CIVIL ACTION NO. _____
⟩ CLASS ACTION COMPLAINT
Retalix Ltd., Retalix USA Inc., Gillon Beck, Brian ⟩ JURY TRIAL DEMANDED
Cooper, Ishay Davidi, Neomi Enoch, Zvi Lieber, ⟩
Amnon Lipkin-Shahak, Ian O'Reilly, Barry ⟩
Shaked, Gur Shomron, and Itschak Shrem, ⟩
⟩
           Defendants. ⟩
_____ ⟩

       Plaintiff Sarit Tamar ("Plaintiff"), on behalf of herself and all others similarly situated, by

her attorneys, alleges the following upon information and belief, except as to those allegations

pertaining to Plaintiff which are alleged upon personal knowledge:

## NATURE OF THE ACTION

       1.     This is a stockholder class action complaint brought on behalf of the public

owners of the stock of Retalix Ltd. ("Retalix" or the "Company") against certain officers and/or

directors of Retalix, and other persons and entities (collectively, "Defendants") who are parties

to a proposed transaction through which the Company will enter into a Share Purchase

Agreement (the "Share Purchase Agreement" or "Agreement") with a group of Investors (the

"Investors") seeking to gain control of the Company.

       2.     The Share Purchase Agreement includes a private placement (the "Private

Placement") of Retalix shares at $9.10 per share and the issuance to the Investors of warrants to

purchase up to an aggregate of 1,250,000 Ordinary Shares at the consummation of the Private

Placement.  The Investors will also launch a tender offer to purchase an additional 7.6% of the Company's shares at $9.10 per share.  Retalix shares traded at approximately $12.43 per share as of October 12, 2009.

3.       The closing of the Share Purchase Agreement is contingent upon the consummation of two share purchase agreements between the Investors and Defendants Barry Shaked and Brian Cooper (the "Founders") containing: (i) a share sale and purchase agreement among the Investors, Ronex Holdings L.P., a limited partnership holding 15.9% of Retalix shares ("Ronex") and Barry Shaked, pursuant to which Shaked will sell 1,033,479 Ordinary Shares held by him to the Investors and Ronex for which he will receive $12.00 per share, or $2.90 per share more than will be offered to public shareholders and at least $2.90 per share more than the Company will sell its shares through shares issued to the Investors (the "Shaked Purchase Agreement"), and (ii) a share sale and purchase agreement between Ronex and Cooper, pursuant to which Cooper will sell his entire Retalix holdings, an aggregate of 751,485 Ordinary Shares, at $12.00 per share, to Ronex (the "Cooper Purchase Agreement", together with the Shaked Purchase Agreement, the "Founders Purchase Agreements").  Thus, Shaked and Cooper will reap 32% more for the sale of their stock than shareholders will receive in the Tender Offer or that the Company will receive in the Private Placement.

4.       Indeed, the Company's own financial advisor has opined that a range of values between $12 and $15 per share may be considered reasonable value for a sale of the Company's shares.

5.       As described below, both the value to Retalix stockholders proposed by this Agreement and the process by which Defendants propose to consummate the Agreement are

2

grossly inadequate and fundamentally unfair to Plaintiff and the other public stockholders of the Company, apart from its unfairness to the Company itself.  Defendants' conduct constitutes a breach of their fiduciary duties owed to Retalix's public stockholders, and a violation of applicable legal standards governing Defendants' conduct.

6.      Plaintiff seeks to enjoin Defendants from consummating the Agreement or, in the event the Agreement is consummated, recover damages resulting from Defendants' violations of their fiduciary duties of loyalty, good faith, due care, and full and fair disclosure.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(B). The amount in controversy exceeds $5,000,000 and a member of the Class of plaintiff is a citizen of a foreign state different from a defendant.

8.      Venue is also appropriate in this Court.  Defendant Retalix USA, Inc. maintains its principal place of business at 6100 Tennyson Parkway, Suite 150, Plano, Texas 75024. Defendant Retalix Ltd., maintains offices in Plano, Texas and regularly conducts business in the State of Texas.

## PARTIES

9.      Plaintiff is and at all relevant times has been the owner of shares of Retalix common stock.

10.      Defendant Retalix Ltd., an Israeli corporation whose American headquarters are located at 6100 Tennyson Parkway, Suite 150, Plano, Texas 75024, is a leading provider of software solutions to retailers and distributors worldwide, with over 40,000 sites installed across more than 50 countries.  Retalix offers software applications that automate and synchronize retail

and supply chain operations, encompassing stores, headquarters and warehouses.  The Company's stock is traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol "RTLX."

11.     Defendant Retalix USA Inc., a subsidiary of Retalix Ltd., is located at 6100 Tennyson Parkway, Suite 150, Plano, Texas 75024.  Defendant Retalix USA, Inc. may be served with citation through its registered agent, Jeff Yelton at 6100 Tennyson Parkway, Suite 150, Plano, Texas 75024.

12.     Defendant Gillon Beck ("Beck") has served as a Director of Retalix since March 2008.

13.     Defendant Brian Cooper ("Cooper") has served as a Director of Retalix since August 1984.

14.     Defendant Ishay Davidi ("Davidi") has served as Chairman of the Company's Board of Directors since August 2008 and as a Director of the Company since March 2008.

15.     Defendant Neomi Enoch ("Enoch") has served as a Director of Retalix since August 2008.

16.     Defendant Zvi Lieber ("Lieber") has served as an External Director and a member of the Audit Committee of Retalix since October 2008.  Lieber also served on the Transaction Committee which purported to negotiate the terms of the Private Placement with the Investors in which the full Board of Directors retained the final authority to approve any transaction.

17.     Defendant Amnon Lipkin-Shahak ("Lipkin-Shahak") has served as a Director of Retalix since April 2002 and is a member of the Audit Committee.  Lipkin-Shahak also served on the Transaction Committee which purported to negotiate the terms of the Private Placement

with the Investors in which the full Board of Directors retained the final authority to approve any transaction.

18.     Defendant Ian O'Reilly ("O'Reilly") has served as a Director of Retalix since November 2000 and is a member of the Audit Committee.

19.     Defendant Barry Shaked ("Shaked"), one of the Company's founders, has served as President and Chief Executive Officer since the inception of the Company in 1982 and as Chairman of the Board from 1982 until August 2008.

20.     Defendant Gur Shomron ("Shomron") has served as an External Director of Retalix since July 2009.

21.     Defendant Itschak Shrem ("Shrem") has served as a Director of Retalix since January 2008.  Shrem also served on the Transaction Committee which purported to negotiate the terms of the Private Placement with the Investors in which the full Board of Directors retained the final authority to approve any transaction.

22.     Defendants Beck, Cooper, Davidi, Enoch, Lieber, Lipkin-Shahak, O'Reilly, Shaked, Shomron, and Shrem are collectively referred to herein as the "Individual Defendants."

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, the Individual Defendants are in a fiduciary relationship with Plaintiff and the other public stockholders of Retalix and owe Plaintiff and the other members of the Class the highest duties of loyalty, good faith, due care, and full and fair disclosure

24.     By virtue of their positions as directors and/or officers of Retalix, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Retalix to engage in the practices complained of herein.

25.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's stockholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value stockholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the stockholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)     that favors their own financial interests over that of the public stockholders

(b)     adversely affects the value provided to the corporation's stockholders;

(c)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(d)     discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

(e)     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's stockholders.

26.     The Individual Defendants, separately and together, in connection with the Agreement, violated duties owed to Plaintiff and the other public stockholders of Retalix, including their duties of loyalty, good faith, due care, and full and fair disclosure, insofar as they engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the public stockholders of Retalix.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure Rule 23, individually and on behalf of all current Retalix security owners (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

28.     This action is properly maintainable as a class action.

29.     The Class is so numerous that joinder of all members is impracticable.  As of September 15, 2009, Retalix had 20,406,363 Ordinary Shares of stock outstanding.  Members of the Class are scattered throughout the United States and abroad and are so numerous that it is impracticable to bring them all before this Court.

30.     Questions of law and fact exist that are common to the Class, including, among others:

(a)     whether the Individual Defendants have fulfilled and are capable of fulfilling their fiduciary duties owed to Plaintiff and the Class;

(b)     whether the Individual Defendants have engaged and continue to engage in a scheme to benefit themselves at the expense of Retalix stockholders in violation of their fiduciary duties;

(c)       whether the Individual Defendants are acting in furtherance of their own self interest to the detriment of the Class;

(d)       whether Defendants have disclosed and will disclose all material facts in connection with the Share Purchase Agreement; and

(b)       whether Plaintiff and the other members of the Class will be irreparably damaged if Defendants are not enjoined from continuing the conduct described herein.

31.       Plaintiff's claims are typical of the claims of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

32.       The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

33.       Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because the Defendants have acted, or refused to act, on grounds generally applicable to the Class.

34.     The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### A.     Background Leading up to Share Purchase Agreement

35.     According to the Proxy Statement disseminated by Retalix on September 21, 2009 (the "Proxy"), on February 9, 2009, Eli Gelman ("Gelman"), one of the Investors, held an initial meeting with Shaked, Chief Executive Officer, President and a member of the Board of Directors of the Company, to present and discuss, in a preliminary manner, a potential investment in the Company.  The Proxy indicates the meeting was initiated by Gelman, who, together with the other Investors, had decided to pursue the possibility of making a strategic investment in the Company.

36.     The Proxy states that, on February 25, 2009,  Davidi, the Chairman of the Board of the Company, on the behalf of the Board of Directors, received from the Investors a non-binding letter expressing their interest in acquiring a 20% equity stake in the Company (excluding warrants), via a private placement at a price per share of $9.00.  The letter proposed that, as part of the prospective transaction, the Company would also issue to the Investors warrants to purchase the number of Ordinary Shares equal to 30% of the Ordinary Shares to be issued in the transaction, exercisable at $9.00 per share, and that the Investors would enter into voting agreements with other major shareholders of the Company upon the signing of the transaction documentation.

37.     The Proxy states that, on February 26, 2009, the Board of Directors held a meeting and discussed the letter received from the Investors, as well as three indications of interest received at around the same time from three different U.S.-based private equity funds. Such indications of interest proposed an acquisition of the Company at a price ranging from **$8.00 to $10.00** per share.  At the meeting, the Board of Directors appointed an Advisor Search Committee that was authorized to search for an appropriate professional advisor that could assist the Board of Directors in evaluating the Company's strategic alternatives.  Defendants Beck, Cooper, Lieber and Shrem were appointed to the Advisor Search Committee.  At that meeting, the Board of Directors determined not to enter into negotiations or due diligence with any potential transaction party until it received the advice of a professional advisor.  At the direction of the Board of Directors, Davidi contacted each of the four potential transaction parties and informed them of the Board's decision.

38.     On March 1, 2009, due to reports in the press regarding transaction proposals received by the Company, the Company issued a press release in which it confirmed the receipt of certain transaction proposals and said that it was evaluating them.

39.     According to the Proxy, on March 16, 2009, the Board of Directors decided to retain Oppenheimer as its exclusive financial advisor.  The Board of Directors requested that Oppenheimer perform a strategic review of the operations and financial condition of the Company, as well as an evaluation of the financing and acquisition proposals received.

40.     The Proxy further states that, on April 27, 2009, representatives of Oppenheimer presented their strategic review and evaluation to the Board of Directors.  The presentation included, among other things, an analysis of the Company's industry and prospects, the M&A

10

landscape and a comparison of the Company to a group of companies having some similar
characteristics based on various criteria.  The analysis was to a degree based on two sets of
financial projections provided by the Company, one representing a conservative outlook and one
representing a more aggressive outlook.  The Oppenheimer team reviewed the assumptions
underlying each scenario and the resulting Company valuations based on the assumptions made,
using several different methodologies.  Oppenheimer noted that the ranges for each of the
valuation methodologies undertaken varied significantly, but that, based on the information
provided and the assumptions made in the conservative scenario, in the aggregate these analyses
suggested that a range of values between **$12.00 and $15.00** per share might be considered
reasonable for a sale of the Company's shares at that time.

     41.     Thus, even based on the most conservative scenario studied by Oppenheimer, and
based upon the price being received by Defendants Shaked and Cooper, the $9.10 per share to be
offered to the members of the Class under the Share Purchase Agreement and the $9.10 per share
exercise price of warrants to be given to the Investors fall well below the fair value of their
shares.

     42.     At the April 27, 2009 meeting, the Oppenheimer team also reviewed the strategic
alternatives presently available to the Company: (i) continuing to pursue the Company's business
plan without effecting any transaction with a third party; (ii) actively seeking to sell the
Company to a strategic or financial buyer in an M&A transaction; or (iii) actively seeking a
financing transaction with a new investor, with particular reference to the proposal received from
the Investors.  The Board of Directors decided to explore the proposal made by the Investors.
The Board of Directors asked Oppenheimer to hold a preliminary meeting with the Investors.  A

11

representative of Oppenheimer subsequently met with Gelman and then recommended that the Board of Directors invite representatives of the Investors to make a presentation to the Board of Directors.

43.     The Proxy states that, on May 13, 2009, representatives of the Investors made a presentation to the Retalix Board of Directors conveying their assessment of the Company, based on publicly available information.  The Investors indicated, among other things, that any transaction with the Company would be contingent upon their entering into a voting agreement with the Company's principal shareholders.  At this meeting, the possibility of whether the Investors would agree to effect a tender offer prior to the consummation of a private placement was also discussed.  After the representatives of the Investors left the meeting, the Board of Directors held a discussion and decided that, subject to notice from the Company's principal shareholders that they have reached an understanding with the Investors regarding shareholder matters, the Company should allow the Investors to commence a due diligence investigation of the Company and commence negotiations with the Investors regarding the terms of the proposed transaction.  The Board of Directors formed a Transaction Committee and authorized the Transaction Committee to negotiate the terms of a transaction with the Investors, but retained the final authority to approve any such transaction.  Appointed to the Transaction Committee were Defendants Lieber, Lipkin-Shahak and Shrem.

44.     On June 1, 2009, representatives of the Company and representatives of the Investors agreed to terms of a confidentiality agreement, which included standstill and exclusivity undertakings, and representatives of the Investors visited the Company to hear management presentations.  The initial term of the exclusivity period was 30 days and was later

extended for an additional 30 days.  This exclusivity period entered into between the Investors and the Company effectively served to shut out all other competing offers, to the detriment of the members of the Class.

45.     According to the Proxy, on June 8, 2009, the Transaction Committee met and selected Shrem to lead the negotiations with the Investors.  Representatives of the Investors then joined the meeting and negotiations on the terms of the transaction ensued.  On June 10, 2009, Shrem received, on behalf of the Board of Directors, a non-binding letter from the Investors that updated and supplemented the Investors' original letter of February 25, 2009 concerning the proposed transaction.  In the letter, the Investors raised the purchase price that they offered to pay in the proposed private placement and in a tender offer to $9.10 per share.  The letter proposed that the Company issue to the Investors warrants to purchase 1,500,000 Ordinary Shares, half of with an exercise price of $9.10 per share, one quarter with an exercise price of $10.10 per share and one-quarter with an exercise price of $11.10 per share.  The letter also reflected the Investors' willingness to acquire a portion of the proposed 20% equity stake in the Company (excluding warrants) directly from Shaked and to provide management services to the Company in consideration for an annual fee.

46.     The Proxy indicates that, on June 22, 2009, at a meeting of the Board of Directors, Shrem updated the Board of Directors on the status of the negotiations and the structure and financial terms of the proposed transaction with the Investors that had been agreed to thus far.  At the meeting, Shaked informed the Board of Directors that he and Cooper had agreed to sell their Ordinary Shares to Ronex and/or the Investors at a price of $12.00 per share, to step down from the Board of Directors at the consummation of the proposed private placement

and to terminate their existing shareholder agreement with Ronex.  Davidi informed the Board of Directors that Ronex had reached an understanding on the terms of a shareholders agreement with the Investors.  The Board of Directors authorized the continuation of the negotiations and the documentation of the proposed transaction with the Investors.  The Board of Directors also decided to invite the Investors to present their plans for the Company once their due diligence investigation had sufficiently advanced.

47.     The Founder Purchase Agreement, whereby Shaked and Cooper agreed to sell their shares at a premium of **32%** over the price shareholders were to receive for the sale of their shares, should have raised serious red flags for the Board of Directors.  Instead, the Board shirked its fiduciary obligations to the Company's public shareholders by proceeding with the negotiations with the Investors.

48.     The Proxy states that, on July 19, 2009, at a meeting of the Board of Directors, Gelman, on behalf of the Investors, presented the results of the Investors' due diligence review. After the representatives of the Investors left the meeting, Shrem updated the Board of Directors on the status of the negotiations and the remaining unresolved issues.

49.     According to the Proxy, on September 1, 2009, a meeting of the Transaction Committee was held, in which representatives of Oppenheimer and the Company's outside counsel participated.  The terms of the Private Placement, the draft Share Purchase Agreement and the transactions contemplated thereby were reviewed.  The Transaction Committee unanimously determined to recommend that the Audit Committee and the Board of Directors approve the Private Placement, the Share Purchase Agreement and the transactions contemplated thereby.

50.     The Proxy goes on to state that, on September 2, 2009, the Board of Directors held a meeting to consider the Private Placement, the Share Purchase Agreement and transactions contemplated thereby.  Shrem reported that, earlier that day, he and a representative of the Investors agreed to change the exercise price of the warrants that were to have an exercise price of $9.10 per share or $10.10 per share to $9.75 per share.  At this meeting, Oppenheimer presented its financial analysis of the terms of the Private Placement and rendered to the Board of Directors an oral opinion (which was confirmed in writing the next day) to the effect that the consideration to be paid to the Company in the transaction was fair, from a financial point of view, to the Company.  Shrem reported to the Board of Directors that the Transaction Committee had unanimously determined that the transaction is in the best interests of the Company and unanimously recommended that the Audit Committee and the Board of Directors (i) approve the Private Placement, the Share Purchase Agreement and the transactions contemplated thereby, and (ii) recommend that the shareholders of the Company approve the Private Placement, the Share Purchase Agreement and the transactions contemplated thereby.  After an explanation of the personal interests of certain officers and directors in the proposed transaction and the requirement of Israeli law for Audit Committee approval of the transaction, the meeting of the Board of Directors was temporarily adjourned.  At such time, the Audit Committee held a meeting, together with representatives of Oppenheimer and the Company's outside counsel. Following a discussion of various aspects of the proposed transaction, the Audit Committee determined to recommend that the Board of Directors (i) approve the Private Placement, the Share Purchase Agreement and the transactions contemplated thereby, and (ii) resolve to recommend that the shareholders of the Company approve the Private Placement, the Share

15

Purchase Agreement and the transactions contemplated thereby.  Following the meeting of the Audit Committee, the Board of Directors reconvened to vote on the proposed transaction. Shomron, the Chairman of the Audit Committee, reported on the vote and recommendation of the Audit Committee.  The Board of Directors then unanimously, among other things (i) determined that the Private Placement, the Share Purchase Agreement and the transactions contemplated thereby to be in the best interests of the Company and its shareholders, (ii) approved the execution, delivery and performance of the Share Purchase Agreement and the consummation of the Private Placement and the other transactions contemplated by the Share Purchase Agreement, (iii) directed management to call a meeting of shareholders and to take such other actions as are necessary to complete the Private Placement and the other transactions contemplated by the Share Purchase Agreement, and (iv) resolved to recommend that the shareholders approve the Private Placement, the Share Purchase Agreement and the transactions contemplated thereby.

51.     On September 3, 2009, the transaction agreements were finalized and signed and the Company issued a press release announcing the transaction.

**B.     The Share Purchase Agreement**

52.     On September 3, 2009, the Company entered into the Share Purchase Agreement with the Investors for the issuance and sale of Ordinary Shares to the Investors and the grant to the Investors of warrants to purchase more Ordinary Shares.

53.     The Share Purchase Agreement requires that the Company issue and sell to the Investors such number of Ordinary Shares (the "Purchased Shares") as will result in the Investors' owning an aggregate of 20% of the outstanding Ordinary Shares after the

consummation of the transactions contemplated by the Share Purchase Agreement (the "Closing").  The Investors already hold an aggregate of 622,843 Ordinary Shares.  The number of Purchased Shares will depend on (i) the number of Ordinary Shares (if any) purchased as a result of the Tender Offer to be effected by the Investors, if certain conditions are met, for up to 1,550,000 Ordinary Shares, (ii) the number of Ordinary Shares (if any) purchased by the Investors from Shaked pursuant to the Shaked Purchase Agreement in respect of 566,740 Ordinary Shares, and (iii) the total number of Ordinary Shares issued and outstanding at the Closing.  The purchase price per share in the Private Placement is $9.10 as opposed to the $12 per share to be paid to Defendants Shaked and Cooper.

54.     The Investors also will receive at the Closing, for no additional consideration, warrants (the "Warrants") to purchase up to an aggregate of 1,250,000 Ordinary Shares (the "Warrant Shares"), as follows:

* Warrants to purchase up to an aggregate of 625,000 Ordinary Shares, at an exercise price of $9.75 per share, having a term of 3.5 years from the Closing;

* Warrants to purchase up to an aggregate of 312,500 Ordinary Shares, at an exercise price of $11.10 per share, having a term of 4.5 years from the Closing; and

* Warrants to purchase up to an aggregate of 312,500 Ordinary Shares, at an exercise price of $12.10 per share, having a term of 4.5 years from the Closing.

55.     All of the Warrants are "in the money," because the exercise price in each instance is less than the price at which Retalix shares currently trade.

56.     The Investors have agreed to effect a Tender Offer prior to the Private Placement if certain conditions are met.  To the extent that the Investors purchase Ordinary Shares from

existing shareholders, the number of Ordinary Shares that the Company will issue and sell in the Private Placement will be reduced.  The Tender Offer will be conditioned only on the concurrent closing of the Private Placement and the absence of legal restraints applicable or deemed applicable to the Tender Offer, the Private Placement, the Founders Purchase Agreements or the respective transactions contemplated thereby.  As promptly as practicable, but in no event later than five business days after the October 19, 2009 shareholder meeting, and subject to shareholder approval of the Private Placement and related transactions and the satisfaction or waiver of the conditions set forth below, the Investors are required to commence a Tender Offer to the shareholders of the Company (the **"**Tender Offer"), for the purchase of up to 1,550,000 Ordinary Shares, representing approximately 7.6% of the outstanding Ordinary Shares (the "Tender Offer Shares"), at $9.10 per share, and for an aggregate purchase price of up to $14,105,000.  If more than 1,550,000 Ordinary Shares are validly tendered and not properly withdrawn in the Tender Offer, the Investors will purchase 1,550,000 Ordinary Shares on a pro rata basis from all shareholders who have validly tendered their Ordinary Shares and have not properly withdrawn them before the expiration of the Tender Offer.   If less than 1,550,000 Ordinary Shares are validly tendered and not properly withdrawn in the Tender Offer, the Investors will purchase all such Ordinary Shares, and the Company will issue and sell to the Investors additional Ordinary Shares in the Private Placement, resulting in the Investors holding 20% of the Company's Ordinary Shares following the Closing.

57.     The Share Purchase Agreement provides that from and after the date of the Share Purchase Agreement and until the Closing, the Company shall not, nor shall it authorize or permit the Company or any of its subsidiaries (together, the "Company Group") or any of its or

18

their respective employees, officers or directors and any agent, investment banker, attorney or other advisor or representative retained by the Company Group, to (i) directly or indirectly solicit, initiate, encourage or induce the making, submission or announcement of any offer or proposal, oral or written, relating to an acquisition transaction; (ii) engage or otherwise participate in any discussions or negotiations regarding, or furnish to any person any non-public information with respect to, or take any other action to facilitate any inquiries or the making of any proposal that constitutes or may reasonably be expected to lead to, any offer or proposal, oral or written, relating to an acquisition transaction; (iii) respond to or engage in discussions with any person with respect to any offer or proposal, oral or written, relating to an acquisition transaction, except as to the existence of these provisions; (iv) approve, endorse or recommend any offer or proposal, oral or written, relating to an acquisition transaction; or (v) enter into any letter of intent or similar document or any contract, agreement or commitment contemplating or otherwise relating to any acquisition transaction.

58.     Following Closing, the Company will fulfill and honor all of its obligations pursuant to existing indemnification agreements in favor of the current or former directors and officers of the Company and any of its subsidiaries in accordance with their respective terms. Without limiting the foregoing, for a period of seven years following the Closing, the Company will cause the Articles of Association, Certificate of Incorporation and Bylaws of the Company and its subsidiaries to contain provisions with respect to insurance and indemnification that are at least as favorable as the provisions contained in such instruments as of the date of the Closing, and not to amend such provisions in a manner that would adversely affect the rights of the indemnitees described above.  The Company may purchase at the Closing, a "tail" policy, which

19

shall include "Side A" coverage, from a reputable insurer, with an effective term of seven years from Closing and which covers each of the indemnitees described above.  Such policy will contain terms that are otherwise similar to those of the Company's directors' and officers' insurance policy in effect on the execution date of the Share Purchase Agreement.

59.     In October 2002, the Company's shareholders approved the replacement of the employment agreement with Shaked with a management services agreement with B.G.A.G.S. Shaked Ltd., a private management company controlled by Shaked (the "Services Agreement"). Concurrently with the execution of the Share Purchase Agreement, the Company entered into a separation agreement (the "Separation Agreement") with Shaked's management company for the termination of services as President and Chief Executive Officer, upon the later of (i) December 31, 2009 and (ii) the Closing, unless the parties agree as to the continuation of services beyond such date, in which case the termination date will be postponed accordingly.  Shaked also agreed to the provisions of the Separation Agreement in his personal capacity.  Pursuant to the Separation Agreement, Shaked's management company will continue to receive the monthly fee and other benefits from the Company through the termination date and during the six-month post-termination period.  In addition, the management company will be entitled to a payment in the amount of $132,930 ( *i.e.,* five monthly fees) to be paid on the termination date, an annual bonus for the year 2009 and an annual bonus for the pro rata portion of the year 2010, if applicable.  The annual bonuses will be calculated according to the provisions of the Services Agreement based on net income, excluding special one-time charges.  The Separation Agreement also provides for a special departure bonus to be paid to Shaked's management company in the amount of $200,000.  On the termination date, the Company will release the

20

moneys accumulated in the various employee funds maintained by the Company on Shaked's behalf, which relate to the period, until 2002, during which Shaked was an employee of the Company.

Pursuant to the Separation Agreement, such options and any additional options that may be granted to him prior to the termination date, will fully vest and become exercisable upon and subject to the Closing, for their original term until their respective expiration dates.  For four years following termination, Shaked will grant the Chairman of the Board of Directors a voting proxy with respect to his Ordinary Shares, to the extent that they constitute more than 2.0% of the outstanding Ordinary Shares.  The confidentiality and assignment of intellectual property undertakings contained in the Services Agreement will survive the termination of the Services Agreement.  Shaked agreed to extend the non-competition and non-solicitation under his management services agreement period from one year to four years in exchange for a payment of $400,000.

60.    Concurrently with the execution of the Share Purchase Agreement, two share purchase agreements with the Founders were executed: (i) a share sale and purchase agreement among the Investors, Ronex and Shaked, pursuant to which Shaked will sell 1,033,479 Ordinary Shares held by him, at $12.00 per share, to the Investors and Ronex, such that the Investors will purchase 566,740 Ordinary Shares and Ronex will purchase 466,739 Ordinary Shares, and (ii) a share sale and purchase agreement between Ronex and Cooper, pursuant to which Cooper will sell his entire holdings in the Company, an aggregate of 751,485 Ordinary Shares, at $12.00 per share, to Ronex.  The closing of the Share Purchase Agreement may not be consummated if the Founders Purchase Agreements are not consummated.

### C.     Defendants and Company Insiders Engaged in Self Dealing

61.     Defendants and/or other Company insiders stand to obtain substantial personal benefits as a result of the Share Purchase Agreement.  Specifically, four of the Company's directors and seven senior employees have interests in the transaction that are different from, or in addition to, public shareholders' interests.  Defendants Shaked and Cooper stand to receive through the Founders Purchase Agreements, $12.00 per share for their 1,033,479, and 566,740 Ordinary Shares respectively, if the Agreement is consummated.  Beck and Davidi are officers of FIMI, the shareholder of Ronex, and therefore have a personal interest in the transactions by virtue of the Shareholders Agreement and the Founders Purchase Agreements.  In addition, Shaked has an additional personal interest in the transactions by virtue of the Separation Agreement.  Furthermore, though they are currently covered by the Company's directors' and officers' insurance policy that is currently in effect, all of the members of the Board of Directors may be deemed to have a personal interest in the purchase of the "tail" insurance policy that the Company intends to purchase effective as of the Closing.

62.     By reason of their positions with Retalix, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Retalix, and especially the true value and expected increased future value of Retalix and its assets, which they have not disclosed to the Company's public stockholders.  Moreover, despite their duty to maximize shareholder value, the Defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of the Company's public shareholders.

63.     The proposed Agreement is wrongful, unfair and harmful to the Company's public stockholders, and represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members.  Specifically, Defendants are attempting to deny Plaintiff and the Class their shareholder rights via the Agreement on terms that do not adequately value the Company and its assets; and Defendants have failed to disclose all material information concerning the true value of the Company. Accordingly, the proposed Agreement will only benefit Defendants.

64.     In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

      (a)     withdraw their consent for the Share Purchase Agreement;

      (b)     act independently so that the interests of the Company's public stockholders will be protected;

      (c)     adequately ensure that no conflicts of interest exist between Defendants' own interests and their fiduciary obligation to maximize stockholder value and, to the extent such conflicts exist, ensure that all conflicts be resolved in the best interests of the Company's public stockholders;

      (d)     solicit competing bids to the Investors' offer to assure that the Company's shareholders are receiving the maximum value for their shares; and

      (e)     fully and fairly disclose all material information to shareholders regarding the Share Purchase Agreement and the true value of the Company.

**D.**     **The Warrant Prices and the Price to be Paid to the Public Shareholders are Unfair**

65.     As a result of Defendants' conduct, the Company's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled through the Share Purchase Agreement entered into between the Company and the Investors.  In order to meet their fiduciary duties, the Defendants are obligated to explore transactions that will maximize shareholder value, instead of structuring a preferential deal for themselves that will allow them to reap profits at the expense of shareholders.

66.     The consideration reflected in the Share Purchase Agreement does not reflect the true inherent value of the Company that was known only to the Individual Defendants, as directors and officers of Retalix, at the time that the Agreement was made and announced.

67.     Oppenheimer noted for the consideration of the Board of Directors, as part of its analysis in connection with the delivery of its opinion, that the per share purchase price to be paid to the Company in the Private Placement, adjusted for the Warrants, using the Black-Scholes option pricing model, represented: (i) a 27.2% discount to the Ordinary Shares' closing price on August 31, 2009, assuming the maximum number of Ordinary Shares tendered in the tender offer; (ii) a 15.2% discount to the Ordinary Shares' closing price on August 31, 2009, assuming the tender of no Ordinary Shares in the tender offer; (iii) a 19.7% discount to the Ordinary Shares' previous 90-trading-day average closing price as of August 31, 2009, assuming the maximum number of Ordinary Shares tendered in the tender offer; (iv) a 6.4% discount to the Ordinary Shares' previous 90-day average closing price as of August 31, 2009, assuming the tender of no Ordinary Shares in the tender offer.  The prices to be paid by the Investors for the Warrants and for the shares in the Tender Offer are grossly inadequate and unfair.

24

68.     As of October 12, 2009, Retalix shares were trading at $12.43 per share, representing a **36%** premium from the unfair and inequitable $9.10 per share price to be paid the shareholders and the $9.10 price to be paid to the Company through the warrants issued to the Investors.

## FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

69.     Plaintiff repeats and realleges each allegation set forth herein.

70.     The Individual Defendants have violated fiduciary duties of loyalty, good faith, due care, and full and fair disclosure owed to public stockholders of Retalix and certain of them have acted to put their personal interests ahead of the interests of Retalix stockholders or acquiesced in those actions by fellow directors or executive officers.

71.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Retalix.

72.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, due care, and full and fair disclosure owed to the stockholders of Retalix because, among other reasons, they failed to take steps to maximize the value of Retalix to its public stockholders, by, among other things: approving the shareholders' share purchase price of $9.10, representing a steep and significant discount from the $10.00 per share price put forward through initial acquisition interest, and the $12.00 - $15.00 per share price Oppenheimer, through its most conservative assumptions, considered a reasonable price for the sale of the Company's shares; approving the issuing of

shares to the Investors at $9.10 per share, a **24%** discount from the $12 per share price the Founders will receive; approving the Founders Purchase Agreements, whereby Shaked and Cooper will receive $12.00 for their Ordinary Shares, a premium of **32%** over the $9.10 offered to the public shareholders; and failing to adequately consider potential acquirers, instead favoring their own, or their fellow directors or executive officers' interests, rather than protect the best interests of Retalix's stockholders.

73.     The Individual Defendants dominate and control the business and corporate affairs of Retalix, and are in possession of private corporate information concerning Retalix's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Retalix which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

74.     By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

75.     As a result of the actions of Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Retalix's assets and businesses and will have their share ownership diluted by the shares which the Investors will be able to purchase upon exercise of their Warrants at unfair prices.

76.     Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.  Unless defendants are enjoined by the Court, they will

26

continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

77.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief and other in her favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class Representative;

B.     Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Share Purchase Agreement, unless and until the Company adopts and implements a procedure or process to obtain an agreement providing the best possible terms for stockholders;

C.     Rescinding, to the extent already implemented, the Share Purchase Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.     Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' breaches of their fiduciary duties;

E.     Awarding Plaintiff damages;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

Dated: October 13, 2009                          Respectfully submitted,

                                                 **HUBBARD & BIEDERMAN, LLP.**


                                                 By: /s/Stephen L. Hubbard
                                                     STEPHEN L. HUBBARD
                                                     State Bar No. 1014050
                                                     slhubbard@hblawfirm.com
                                                     ROBERT W. BIEDERMAN
                                                     State Bar No. 02301050
                                                     rwbiederman@hblawfirm.com
                                                     DAVID M. GROSSMAN
                                                     State Bar No. 00787598
                                                     dmgrossman@hblawfirm.com
                                                     1601 Elm Street, Suite 1995
                                                     Dallas, TX 75201
                                                     Tel:  (214) 857-6000
                                                     Fax: (214) 857-6001

                                                     **Plaintiff's Liaison Counsel**

**OF COUNSEL:**

**WEISS & LURIE**
Joseph H. Weiss
David C. Katz
551 Fifth Avenue
Suite 1600
New York, New York  10176
(212) 682-3025

28